IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GLENN A. WESTOVER,

    Plaintiff,                  No. CIV S-06-1336 LKK GGH P

    vs.

DOCTOR DOUST, et al.,          <u>ORDER AND</u>

    Defendants.            <u>FINDINGS & RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants provided constitutionally inadequate medical care. Pending before the court are cross-motions for summary judgment. Plaintiff filed his summary judgment motion on May 23, 2007. Defendants filed their summary judgment motion on June 28, 2007. After carefully considering the record, the court recommends that plaintiff's motion be denied and defendants' motion be granted.

        On September 4, 2007, plaintiff filed an amended complaint. For the reasons discussed at the conclusion of these findings and recommendations, plaintiff's amended complaint is stricken.

/////

1

II. Summary Judgment

    A. Summary Judgment Standards Under Rule 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
>
> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of

1  specific facts in the form of affidavits, and/or admissible discovery material, in support of its
2  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,
3  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is
4  material, i.e., a fact that might affect the outcome of the suit under the governing law, see
5  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.
6  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the
7  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the
8  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

9  　　　　　In the endeavor to establish the existence of a factual dispute, the opposing party
10 need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
11 claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
12 versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary
13 judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
14 genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.
15 56(e) advisory committee's note on 1963 amendments).

16 　　　　　In resolving the summary judgment motion, the court examines the pleadings,
17 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
18 any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,
19 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the
20 court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.
21 at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's
22 obligation to produce a factual predicate from which the inference may be drawn.  See Richards
23 v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902
24 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than
25 simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record
26 taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On September 19, 2006, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

### B.  Legal Standard for Eighth Amendment Claim

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference." Of course, negligence is insufficient. Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk. Id. at 842, 114 S. Ct. at 1981.

It is nothing less than recklessness in the criminal sense – subjective standard – disregard of a risk of harm of which the actor is actually aware. Id. at 838-842, 114 S. Ct. at 1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at 1981. However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing

1 Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-
2 1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends
3 to provide additional support for a claim of deliberate indifference; however, it does not end the
4 inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the
5 medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those
6 needs, the more likely it is that a plaintiff has established deliberate indifference on the part of
7 the defendant."  McGuckin, 974 F.2d at 1061.

8         Superimposed on these Eighth Amendment standards is the fact that in cases
9 involving complex medical issues where plaintiff contests the type of treatment he received,
10 expert opinion will almost always be necessary to establish the necessary level of deliberate
11 indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there
12 may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the
13 treatment he received equated with deliberate indifference thereby creating a material issue of
14 fact, summary judgment should be entered for defendants.  The dispositive question on this
15 summary judgment motion is ultimately not what was the most appropriate course of treatment
16 for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,
17 criminally reckless.

18         C.  Discussion

19         This action is proceeding on the original complaint filed June 16, 2006.  The
20 defendants are Dr. Doust and Dr. Sawicki.  Plaintiff alleges that he had an infection in his right
21 foot.  He claims that every time it started to improve, defendant Doust discontinued the drug he
22 was taking to fight the infection, Rocephin.  Plaintiff claims that defendant Doust told him that
23 the infection was HIV related cancer, i.e. Karposi, and that his foot would have to come off.
24 Plaintiff alleges that defendant Sawicki looked at his foot for less than 60 seconds and told
25 plaintiff that if he did not have his foot amputated, he would die.  Plaintiff finally gave in to
26 having the amputation because the pain was unbearable.

1   The following facts are undisputed.  At all relevant times, plaintiff was
2 incarcerated at the California Medical Facility (CMF).  Defendant Doust works as a physician
3 and surgeon at CMF.  Defendant Sawicki is a podiatry consultant at CMF.  Plaintiff's left lower
4 leg was amputated on February 11, 2005, at Queen of the Valley Hospital (QVH) in Napa,
5 California.

6   *Defendant Doust*

7   The court first considers the cross-motions as to defendant Doust.  In his
8 declaration attached to defendants' motion, defendant Doust states that he saw plaintiff for
9 complaints related to his foot on one occasion, February 7, 2005, in the CMF hospital where he
10 was making rounds.  Doust decl., ¶ 4.  Defendant Doust was not plaintiff's primary care
11 physician.  Id.  Defendant observed that plaintiff was suffering from, among other things, chronic
12 cellulitis and had been receiving injections of Rocephin for one year.  Id., ¶ 5.  Rocephin is an
13 antibiotic.  Id.

14   Cellulitis is a bacterial infection in the skin that can spread within the tissue and as
15 it progresses, it can spread further and further, and can be very painful and potentially life
16 threatening.  Defendants' summary judgment motion, defendant Sawicki decl., ¶ 5.  Treatment
17 for cellulitis generally involves antibiotics, drainage and medications to control pain.  Id.  In rare
18 cases, amputation may be the last resort.  Id.

19   According to defendant Doust, plaintiff told him that he did not want any more
20 injections of Rocephin because he did not believe he was deriving any benefit from it.  Doust
21 decl., ¶ 5.  Defendant Doust prescribed Clindamycin as an alternative antibiotic that was not
22 administered via injection.  Id.

23   In light of plaintiff's condition and his telling him that the injections were
24 providing no relief, defendant Doust referred plaintiff to podiatry for a consultation.  Id., ¶ 6.
25 Defendant Doust was not involved in the recommendation or decision to perform the amputation
26 or surgery.  Id., ¶ 7.

Plaintiff's summary judgment motion does not specifically address his claims against defendant Doust.[1] In his unverified opposition, plaintiff states that defendants' allegation that he took Rocephin shots for one year is false. Plaintiff also states that he saw defendant Doust at least four times. Attached to plaintiff's complaint, cross-motion and opposition are some of his medical records. None of these records support these claims.

In his verified complaint, plaintiff claims that defendant Doust told him that the leg problems were related to Karposi and that the leg would have to come off. However, plaintiff has offered no admissible evidence demonstrating that defendant Doust was involved in the decision to amputate his lower leg. Rather, the admissible evidence demonstrates that defendant Doust referred plaintiff to a podiatrist after examining plaintiff on the one occasion and was not involved in the decision to perform the amputation. For these reasons, whether or not defendant Doust made these statements is not a *materially* disputed fact.

Plaintiff has offered no admissible evidence countering defendants' evidence that defendant Doust examined him for complaints related to his foot on one occasion, at which time he prescribed a different antibiotic and referred him for a podiatry consultation.

Defendants' unopposed evidence demonstrates that defendant Doust did not act with deliberate indifference to plaintiff's serious medical needs on the one occasion he examined him for complaints related to his foot. Accordingly, defendant Doust should be granted summary judgment.

*Defendant Sawicki*

In support of their argument that defendant Sawicki did not act with deliberate indifference to plaintiff's serious medical needs, defendants refer to the declaration of defendant Sawicki. The court will quote from the relevant portions below:

---

[1] In his unverified opposition to defendants' motion, plaintiff claims that when he returned to CMF after the amputation, he was denied adequate pain medication by prison doctors. However, the complaint contains no allegations regarding plaintiff's post-surgery treatment. Plaintiff may not amend his complaint by way of his summary judgment motion.

4. On or about February 10, 2005, I was consulting at CMF and saw plaintiff Glen Westover, for complaints relating to his cellulitis. I believe this was the only time I saw Mr. Westover as a patient. (Copies of my consult notes and progress notes are attached hereto as Exhibit A.)

*****

6. When I saw Mr. Westover on February 10, 2005, I was somewhat taken aback by how bad his foot and leg were. Mr. Westover had cellulitis of his right leg and foot with associated gangrenous and violaceus lesions on his leg. Mr. Westover had been undergoing treatment for his cellulitis for approximately a year or longer and was in a great deal of pain and told me that the antibiotics he had been receiving for about one year had provided him with little to no relief. I reviewed his entire chart, noting his history and how long he had been treated for the cellulitis, and spent approximately 15 to 20 minutes with Mr. Westover. I became aware at some point that an amputation had been recommended at Queen of the Valley Hospital ("QVH") in Napa on at least one prior occasion but that Mr. Westover declined (I see that the admission summary from QVH that Mr. Westover provided with his complaint also indicates that he had gone to QVH previously but had refused surgery.) Mr. Westover made it clear to me that he wanted the leg taken off. (Exhibit B is a Physician's Progress Note in which Mr. Westover said, on February 4, 2005, that he "was ready to have his foot cut off.")

7. During my examination of Mr. Westover, I became genuinely concerned that his life was in danger as a result of the cellulitis and gangrene. There is no cure or treatment for gangrene as it is dead tissue. The only course is to remove the dead tissue. If there are multiple areas of gangrenous tissue, then amputation is often times called for. If the cellulitis had become septicemic and gotten into his blood stream, it could become life threatening. I also took into consideration Mr. Westover's compromised immune system as it could have an effect on his any [sic] healing process. I felt that the prolonged nature of Mr. Westover's lower limb disease and its inability to heal over this period of time would put his life in jeopardy. I therefore recommended that a right leg amputation be considered.

8. As a result of my examination, I referred Mr. Westover to Infectious Diseases for a second opinion and to determine whether an amputation was appropriate and necessary. In addition, I was concerned about the possibility of Kaposi's Sarcoma (a cancer-like disease). I did not diagnose Mr. Westover as having Kaposi Sarcoma, but noted on the consultation "possible Kaposi." (The Surgical Pathology Report Mr. Westover provided with his complaint, attached hereto as Exhibit C, shows Kaposi was not found. This would not change my recommendation.)

9. As a podiatrist, I cannot make a decision to amputate a limb. I can only refer the patient for evaluation and of the appropriateness and necessity of an amputation. Ultimately, the surgeons will make the decision as to whether or not to perform the surgery. (Attached as Exhibit D is the QVH Consultation of February 11, 2005.) The same admission for the surgery which Mr. Westover attaches to his complaint that indicates he had gone to QVH for an amputation on a prior occasion also indicates that the surgeons there felt that the amputation was warranted. (Exhibit E).

1    10. I was not otherwise involved in the care and treatment of Mr. Westover, and did not see him on any other occasion, and was not involved in any of his prior health care or treatment or in the post-operative care of Mr. Westover.

11. I did not lie to Mr. Westover or mislead him about his condition or the basis for my belief that he needed the amputation. When I examined him, I did not see another alternative at the time and only considered amputation as a last resort to save Mr. Westover's life. Had there been any other medically appropriate treatment that might have avoided the amputation, I would have recommended such a course of treatment.

12. Based on this review of the records and the post-operative pathology report, and my single examination of Mr. Westover, it is clear to me that the amputation was an appropriate and necessary course in light of what I felt to be a possible life threatening condition. My view that the amputation was appropriate here is confirmed by the Surgical Pathology Report from QVH which shows the presence of multiple gangrenous ulcerations and massive stasis changes, meaning there most likely was minimal blood flow to the tissue, and by the decision of the surgeons and other physicians that the amputation was appropriate. As a podiatrist I cannot perform, order, or dictate an amputation and am not a decision-maker on the ultimate decision as to whether or not an amputation will be performed. Had the amputation not been felt to be appropriate by the physicians at the hospital, it would not have been done, notwithstanding my recommendation that amputation be considered.

Sawicki declaration.

According to his declaration, defendant Sawicki recommended the amputation for three reasons: 1) the seriousness of plaintiff's symptoms at the time of his examination, i.e. cellulitis and gangrene; 2) plaintiff's compromised immune system as it could effect his healing process; and 3) the prolonged nature of plaintiff's lower limb disease and its inability to heal over time. Sawicki declaration, ¶ 7.

Plaintiff does not appear to dispute, and offers no evidence to the contrary, that his right leg and foot had cellulitis with associated gangrenous and violaceus lesions at the time defendant Sawicki examined him.

In his verified complaint, plaintiff states that his HIV was always very well managed, apparently disputing defendant Sawicki's suggestion that his immune system, compromised by HIV, effected his healing process. However, plaintiff has offered no expert evidence demonstrating that his HIV, even if well managed, did not effect the ability of his body

to heal.

Plaintiff disputes the claim that his lower limb disease was prolonged in nature. In his unverified summary judgment motion and opposition, plaintiff suggests that defendant Sawicki recommended the amputation as a cost-saving measure. Plaintiff claims that he agreed to the surgery only after defendant Sawicki falsely told him that he needed the amputation because he had Karposi cancer. However, in his verified complaint, plaintiff states that he finally gave in to the surgery because the pain was unbearable, not because defendant Sawicki told him that he had Karposi cancer.

As indicated above, defendants' evidence demonstrates that defendant Sawicki would have recommended the amputation even if he had verified that plaintiff did not have Karposi cancer. In his consultation notes attached to his declaration as Exhibit A, defendant Sawicki wrote "possible Karposi?" and "Karposi over *** of foot and leg." Defendant Sawicki was concerned about the possibility of Karposi's sarcoma, but did not diagnose the disease. Sawicki decl., ¶ 8. Although Karposi's was not found, this fact would not have changed his recommendation that plaintiff's lower leg be amputated. Id.

In his unverified opposition and summary judgment motion, plaintiff also argues that his lower limb disease was not chronic because he had an infection in his right foot in February 2004, which was successfully operated on. Plaintiff claims that his next infection was not until December 2004 at which time defendants determined that it would be more cost effective to amputate his lower leg. The medical records submitted by plaintiff do not support these claims.

Plaintiff also disputes defendants' claim that he refused amputation surgery at QVH on a previous occasion. Plaintiff's alleged refusal of surgery on a previous occasion would support defendant Sawicki's claim that plaintiff's leg injury was chronic. However, defendant Sawicki based his finding that plaintiff's condition was chronic on other factors, such as his determination that plaintiff had been undergoing treatment unsuccessfully for this

1 condition for a year or longer. Sawicki declaration, ¶ 6. Accordingly, the court does not find that
2 whether or not plaintiff refused surgery on a previous occasion is a materially disputed fact.
3   While defendant Sawicki did not provide the court with the medical records prior to the
4 surgery on which he based his finding that plaintiff's limb disease was prolonged, he states that
5 his conclusion of this condition was based on his review of plaintiff's medical chart. The
6 February 11, 2005, consultation report prepared by Dr. Wenneker at QVH also reflects the
7 chronic nature of plaintiff's condition:

> HISTORY:
>
> This is a 44 year old man with severe pain involving his right lower extremity. Apparently he has been in the hospital before and had infection drained from the right foot. The cellulitis of the right foot and ankle has not healed. He has nonhealing wounds. This has been very painful. It is felt that this maybe secondary to his AIDS. The patient is being treated for this infection. He has been advised to undergo a right below-knee amputation. He has been seen by several doctors at California Medical Facility and also a podiatrist who has supported the recommendation for amputation....
>
> *****
>
> IMPRESSION:
>
> A 44 year old man with AIDS. The patient has chronic infection involving his right lower extremity. This has not responded to both conservative and surgical intervention. He is in chronic severe pain. For this reason, he is [sic] requested an amputation. It appears that with a good popliteal pulse, that he will be able to heal a below the knee amputation and ultimately be able to ambulate using a prosthesis.

Sawicki decl., exhibit D.

  Defendants' have presented sufficient evidence in support of their summary judgment motion demonstrating that plaintiff's lower leg disease was prolonged and had difficulty healing over time.

  For the reasons discussed above, the court finds that plaintiff has not demonstrated that defendant Sawicki acted with deliberate indifference. Defendants have presented sufficient evidence, which plaintiff has not adequately opposed, demonstrating that defendant Sawicki did not act with deliberate indifference to plaintiff's serious medical needs

when he recommended that plaintiff's right lower leg be amputated. The undersigned emphasizes that he is not weighing facts. The undersigned has determined pursuant to Eighth Amendment standards that no *material* issue of facts exists. Accordingly, defendant Sawicki should be granted summary judgment.

III. Amended Complaint

Following submission of the cross-motions, on August 31, 2007, plaintiff filed an amended complaint. The amended complaint contains the same claims against defendants Doust and Sawicki as are contained in the original complaint. However, the amended complaint names three new defendants: Dr. Dillon, Dr. Bick and Dr. Wenneker.

Plaintiff alleges that Dr. Dillon, an emergency room physician, was the last person to clear plaintiff for transfer to QVH for the amputation. Plaintiff allege that Dr. Bick, as the Chief Medical Officer, was responsible for ensuring that all inmates at CMF receive adequate medical care. Plaintiff alleges that Dr. Wenneker, the surgeon at QVH, did not determine whether there were less harsh treatments for plaintiff's leg than amputation.

Plaintiff did not file a motion for leave to amend with his amended complaint. For this reason, the amended complaint is stricken. See Fed. R. Civ. P. 15(a) (once an answer has been filed, a party may amend a pleading only by leave of court or by written consent of the adverse party). Had plaintiff filed a motion for leave to amend, it most likely would have been denied as untimely, prejudicial and futile. Roth v. Marquez, 942 F.3d 617, 628 (9th Cir. 1991) (in considering motion for leave to amend, court considers the following factors: 1) bad faith; 2) futility; 3) undue delay; and 4) prejudice to opposing party)).

Accordingly, IT IS HEREBY ORDERED that plaintiff's amended complaint filed September 4, 2007, is stricken;

IT IS HEREBY RECOMMENDED that:

1. Plaintiff's May 23, 2007, summary judgment motion be denied;

2. Defendants' June 28, 2007, summary judgment motion be granted.

1         These findings and recommendations are submitted to the United States District
2 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty
3 days after being served with these findings and recommendations, any party may file written
4 objections with the court and serve a copy on all parties.  Such a document should be captioned
5 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
6 shall be served and filed within ten days after service of the objections.  The parties are advised
7 that failure to file objections within the specified time may waive the right to appeal the District
8 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 11/19/07

                                                    /s/ Gregory G. Hollows
                                                    UNITED STATES MAGISTRATE JUDGE

west1336.sj